AO 106 (Rev. 6/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In the Matter of the Search of Property located at ) <br> 7 Pearls Lane, Greenville, South Carolina, ) <br> more fully described below ) | Case No. 6:19 cr 251 |

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

The premises to be searched is described as follows: A single family dwelling located at 7 Pearls Lane, Greenville, South Carolina (hereafter the TARGET LOCATION). The TARGET LOCATION is composed of beige vinyl siding with white trim, and sits on a foundation or crawlspace, which is visible from the front of the residence, and composed of cinder block. The roof is pitched with brown shingles. As one faces the TARGET LOCATION from the street, there is a driveway leading down the right hand side of the residence. From the driveway there is a walkway which leads to a covered porch on the front of the residence supported by four white columns. The number "7" is displayed in black lettering on the second from right porch column. The front door, which is brown in color with a rectangular glass insert, is centered under the covered porch. The residence has two single-pane windows located to the left of the front door along with two single-pane windows located to the right of the front door. The windows are flanked on either side by brown faux shutters. At the street, there is a black mailbox with the number "7", in black lettering over a white background, displayed on the front face along with a blue open faced newspaper box hung below the mailbox to the right side of the driveway. If one was on Augusta Road at the intersection of Interstate 85 then one would travel on Augusta Road towards Greenville. At the intersection with Frontage Road one would turn left on Frontage Road and travel towards Pearls Lane. At the intersection with Pearls Lane one would turn right onto Pearls Lane. The TARGET LOCATION is the third house on the left side of Pearls Lane. Also to be searched are all sheds, outbuildings, appurtenances, and vehicles (associated with the occupants of THE PREMISES TO BE SEARCHED) located on the property, as well as the electronic contents of wireless telephones, computers, or other digital storage or media located at the premises, or within any sheds, outbuildings, appurtenances, and vehicles located on the property. Probable cause has been established that on the premises to be searched, there is now concealed: (1) controlled substances and drug paraphernalia; (2) currency, financial instruments, precious metals, jewelry, and other items of value, which are the fruits of drug trafficking; (3) firearms and other weapons; (4) records of drug transactions, including notes, ledgers, receipts, e-mails, computer files, photographs, video tapes, telephone records, calling cards, and correspondence which contain information on current and past associates, and may used to identify co-conspirators who have not yet been fully identified or located; (5) fictitious identification and other documents which are intended to conceal identity and avoid detection by law enforcement, including fictitious driver's licenses, passports, photo identification cards, and documents relating to fraudulently obtained vehicle titles, registrations, and insurance; (6) currently and/or previously used cellular telephones and electronic communications devices, including the electronic contents of those devices (i.e. electronic telephone directories, photographs, text messages, etc.); (7) books, records, receipts, notes, ledgers, currency and papers which are evidence of the commission of narcotics and/or money laundering offenses. The records include tally or ledger sheets; sales and/or purchase invoices; band, wire transfer and/or financial institution records; federal and state corporate, partnership, individual and/or other tax and information returns filed or required to be filed.

The basis for the search under Fed.R.Crim.P. 41(c) is (check one or more):

X evidence of a crime;

X contraband, fruits of crime, or other items illegally possessed;

X property designed for use, intended for use, or used in committing a crime;

⊥ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Possess with Intent to Distribute Methamphetamine and Cocaine |

The application is based on these facts:

\# Continued on the attached sheet.

⊥ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested _____ under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

TFO Kevan P. Kyle, Drug Enforcement Administration
Printed name and title

Sworn to before me and signed in my presence.

Date: 3/7/19          _____
Judge's signature

City and State: Greenville, South Carolina          Kevin F. McDonald, U.S. Magistrate Judge
Printed name and title

**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

IN THE MATTER OF THE APPLICATION    )        CASE NO.:
OF THE UNITED STATES OF AMERICA    )
FOR AN ORDER AUTHORIZING A         )
SEARCH WARRANT FOR THE RESIDENCE   )
LOCATED AT 7 PEARLS LANE,           )
GREENVILLE, SOUTH CAROLINA       )

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Task Force Officer (TFO) Kevan P. Kyle, Drug Enforcement Administration (DEA), being duly sworn, depose and state the following:

1. I am an investigative or law enforcement officer of the United States within the meaning of Title 21, United States Code, Section 878. I am assigned to the U.S. Drug Enforcement Administration (DEA) as a Task Force Officer, and have been so assigned since April 2018. Prior to being assigned to the DEA, I was and continue to be an employee of the Spartanburg County Sheriff's Office (SCSO), where I had been employed since October 22, 2007. During my tenure with the (SCSO), I worked as a Narcotics Investigator for approximately three (3) years. During my tenure as both a Federal and Local drug investigator, I have written numerous search warrants, geolocation tracking affidavits, and arrest warrants. Additionally, I regularly directed the controlled purchase of illegal narcotics while working in an undercover capacity, and frequently utilized the services of informants and other confidential sources of information. I am familiar with the terminology and distribution methods used by drug traffickers, as well as the methods of packaging, transporting, and ingesting numerous types of controlled substances. I have received training, both formal and informal, in the investigation of violations of controlled substance offenses, including schools regarding general narcotics investigation. I have participated in the investigation, arrest, and prosecution of numerous drug traffickers.

## PREMISES TO BE SEARCHED

2. This affidavit is being submitted in support of an application for a search warrant at **7 Pearls Lane, Greenville, South Carolina** (hereinafter referred to as the PREMISES TO BE SEARCHED, or TARGET LOCATION). The TARGET LOCATION is more fully described as follows:

3. The TARGET LOCATION is a single family dwelling located at 7 Pearls Street, Greenville, South Carolina. The TARGET LOCATION is composed of beige vinyl siding with white trim, and sits on a foundation or crawlspace, which is visible from the front of the residence, and composed of cinder block. The roof is pitched with brown shingles. As one faces the TARGET LOCATION from the street, there is a driveway leading down the right hand side of the residence. From the driveway there is a walkway which leads to a covered porch on the front of the residence supported by four white columns. The number "7" is displayed in black lettering on the second from right porch column. The front door, which is brown in color with a rectangular glass insert, is centered under the covered porch. The residence has two single-pane windows located to the left of the front door along with two single-pane windows located to the right of the front door. The windows are flanked on either side by brown faux shutters. At the street, there is a black mailbox with the number "7", in black lettering over a white background, displayed on the front face along with a blue open faced newspaper box hung below the mailbox to the right side of the driveway. If one was on Augusta Road at the intersection of Interstate 85 then one would travel on Augusta Road towards Greenville. At the intersection with Frontage Road one would turn left on Frontage Road and travel towards Pearls Lane. At the intersection with Pearls Lane one would turn right onto Pearls Lane. The TARGET LOCATION is the third house on the left side of Pearls Lane. A photograph of the TARGET LOCATION is provided in conjunction with this affidavit, and incorporated as "Attachment A."

2

4.  Also to be searched are all sheds, outbuildings, appurtenances, and vehicles located at the TARGET LOCATION, as well as the electronic contents of any computers, removable media (including thumb drives, removable hard drives, compact discs, or any other device which can maintain digital/electronic data), digital video recorders or hard drives, wireless telephones, or other telecommunications devices located at the premises, or within any sheds, outbuildings, appurtenances, and vehicles located on the property .

5.  Based upon my training and experience as a narcotics agent, I know the following:

    a.  Drug traffickers regularly obtain and utilize multiple locations (i.e. houses and apartments) so as to allow them to have more than one place to store contraband and/or conduct drug-related business.

    b.  Drug traffickers frequently store controlled substances and drug paraphernalia for packaging, diluting, weighing and/or distributing controlled substances in, on, and around residence and/or business, and within vehicles and/or structures located on their property or its surrounding curtilage in an effort to avoid detection by law enforcement.  This paraphernalia often includes but is not limited to:  scales, plastic bags, diluting agents, etc.

    c.  Drug traffickers frequently store currency, financial instruments, precious metals, jewelry, and other items of value, which are the proceeds of drug transactions inside, on, and around their residence and/or place of business.

    d.  Drug traffickers frequently have in their possession, whether on their person, inside their vehicle, or in, on, or around their residence, firearms and other weapons.  These firearms and weapons are commonly used by drug traffickers to protect their property, including, but not limited to: controlled substances; drug proceeds in the form of currency, jewelry and other real property; and other items of value whose existence may be considered illegal.

3

e.  Drug traffickers frequently maintain in their residence and/or business, records of drug transactions, including notes, ledgers, receipts, computer files, photographs, video tapes, digital video recorders and associated hard drives memorializing footage  generated by closed circuit or internet-based video camera systems, telephone records, calling cards, and correspondence which contain information on current and past associates, and may be used to identify co-conspirators who have not been identified or located.

f.  Drug traffickers frequently maintain fictitious identification and other documents which are intended to conceal their identity and avoid detection by law enforcement, including fictitious driver licenses, passports, photo identification cards, and documents relating to fraudulently obtained vehicle titles, registrations, and insurance.

g.  Drug traffickers frequently maintain in their residence currently and previously used wireless telephones and/or electronic communications devices, particularly those wireless telephones and/or electronic communications devices which require the telephone and/or electronic communications device to be purchased. Drug traffickers frequently store digital and voice messages and phone numbers, belonging to drug purchasers, and other drug traffickers.

h.  Drug traffickers regularly use computers in furtherance of drug trafficking and money laundering crimes, by maintaining illegal records and ledgers on the hard drives (or associated removable media) of said computers.  Drug traffickers and money launders also regularly use computers to communicate with one another by way of e-mail, or other telecommunications devices using voice over internet protocol (VOIP), which work in conjunction with computers.

i.  Drug traffickers and money launderers maintain books, records, receipts, notes, ledgers, currency and papers which are evidence of the commission of their narcotics and money laundering offenses. The records include tally or ledger sheets; sales and/or purchase invoices; bank, wire transfer and/or other financial

institution records; federal and state corporate, partnership, individual and/or other tax and informational returns filed or required to be filed.

## FACTS SUPPORTING PROBABLE CAUSE

## BACKGROUND INVESTIGATION

## INFORMATION PROVIDED BY CS-1 IN JANUARY OF 2019

6. Beginning in January of 2019, a confidential source (hereinafter CS-1, or he/she) began providing information to the DEA about a group of unidentified individuals whom he/she had been put in contact with, who were attempting to purchase large quantities of cocaine and methamphetamine.[1]  An intermediary eventually made a telephonic introduction of CS-1 to UM-1, who then started dealing directly with one another via telephone.

7. During multiple conversations on the telephone, CS-1 learned that UM-1 was currently incarcerated, and had another subject (subsequently identified as Jermany SULLIVAN) who was acting as UM-1's representative on the outside.[2]  Over the course of his communications with CS-1, UM-1 referred to SULLIVAN as his brother or cousin.  In the course of their communications, UM-1 and CS-1 agreed to consummate a transaction wherein CS-1 would furnish ten kilograms of cocaine at $29,000 per kilogram, and ten kilograms of methamphetamine at $5,000 per kilogram, and then provide UM-1 and additional five kilograms of cocaine and five kilograms of methamphetamine on consignment.  UM-1 agreed to send his representative (later identified as SULLIVAN) to consummate the transaction with CS-1 in Charlotte, North Carolina on January 30, 2019.

---

[1] CS-1 has a limited criminal history, and a review of that history shows no apparent felony convictions.  CS-1 is currently working with the DEA in hope of financial reward, however, no promise has been made to CS-1 regarding any such reward.  CS-1 has been working with the DEA for an extended period of time, and has repeatedly shown himself/herself to be reliable.  CS-1's information has been corroborated on many occasions, through means including but not limited to recorded telephone calls and physical surveillance.  Information provided by CS-1 has resulted in numerous seizures of both illegal drugs and drug proceeds, as well as the arrests of multiple individuals.

[2] SULLIVAN is a drug trafficker who is well known to drug investigators in the Upstate area of South Carolina, has been the target of previous DEA investigations, and has been convicted of felony drug crimes in the past.

The communications in question involved both UM-1 (using a contraband cellphone bearing associated telephone number (864) 867-9718, hereinafter TT#1), and a subject believed to be SULLIVAN, using a cellphone bearing associated telephone number (864) 526-9024 (hereinafter TT#2).[3,4]

### SEIZURE OF $40,000 AND IDENTIFICATION OF JERMANY SULLIVAN ON JANUARY 30, 2019

8. On January 30, 2019, using TT#1 and TT#2, UM-1 and SULLIVAN coordinated via telephone with CS-1 to carry out the referenced drug transaction. As it relates specifically to TT#2, SULLIVAN and CS-1 engaged in several conversations over TT#2 wherein the two discussed where the transaction would take place, and wherein CS-1 explained to SULLIVAN that SULLIVAN would have the opportunity to check all of the drugs which SULLIVAN would be purchasing once the two met together. Eventually, SULLIVAN (driving a white Nissan Maxima, in which he was the sole occupant) was stopped by marked North Carolina State Police units on Interstate 85 near Exit 14. A roadside investigation led to the discovery of $40,000, inside of a black backpack located in the Maxima. The money was seized, and SULLIVAN was released. Shortly after the seizure, UM-1 called CS-1 and told CS-1 what had happened.

### CURRENT INVESTIGATION

9. Almost immediately after the seizure of the money from SULLIVAN, UM-1 provided a new telephone number to CS-1: (843)535-3806 (hereinafter TT#4).[5] In the days that

---

[3] Both TT#1 and TT#2 are telephones operating under pre-paid accounts. Subpoenaed information has established that neither phone bears any substantive subscriber information.

[4] All communications wherein either UM-1 and/or SULLIVAN spoke or texted with CS-1 were recorded, and are available for review.

[5] Subpoenaed information relative to TT#4 established that the telephone number was activated on January 30, 2019, and bears no substantive subscriber information. Supoenaed information also established that the same International Mobile Subscriber Identity (IMSI) had been assigned to both TT#1 and TT#4, thereby indicating that the same Subscriber Identity Module (SIM) card (i.e. a small electronic chip which allows certain types of cellphones to function) had been used in conjunction with both telephone numbers. I know through my experience that inmates using contraband cellphones frequently change telephone numbers, but he IMSIs/SIMs associated with those telephone numbers often remain the same.

followed the seizure from SULLIVAN (up to and including February 14, 2019), UM-1 (using TT#4) spoke and texted with CS-1, explaining that he (UM-1) still wanted to do business, and would continue working with CS-1 in an effort to make a drug transaction happen in future. CS-1 and UM-1 agreed to the idea of having their respective representatives meet for a meeting to discuss negotiations in person.

10. Specifically, on February 13, 2019, UM-1 texted CS-1, and explained to UM-1 that his (UM-1's) cousin would be the point of contact for the future meeting. CS-1 asked UM-1 to send CS-1 a telephone number for the cousin, and UM-1 texted a screenshot of a telephone number (864)371-9956 (TT#8) for UM-1's cousin, whom UM-1 referred to as "Tee."[6]  On February 14, 2019, UM-1 texted CS-1, stating "Just told my cousin be looking for a call."

11. On February 15, 2019, ACSO Detective Andres Acevedo (acting in a undercover capacity) spoke with "Tee" LNU over TT#8. Det. Acevedo told "Tee" that he (Det. Acevedo) was told to call Tee by Det. Acevedo's brother-in-law (CS-1). "Tee" affirmed, and asked Det. Acevedo "Where I need to go to to talk?" Det. Acevedo explained that he would be in the South Carolina area the following week, and would let "Tee" know a day or two ahead of time. "Tee" affirmed.

## UNDERCOVER MEETING AND CONCLUSIVE IDENTIFICATION OF SHANNON DAVIS (A/K/A "TEE") ON FEBRUARY 28, 2019

12. On February 15, 2019, U.S. Magistrate Judge Jacquelyn D. Austin authorized an order allowing for the acquisition of location data relative to TT#8. The accuracy of GPS "pings" relating to TT#8 was generally inaccurate (1800 meters or more). On several occasions, however, the device pinged with accuracy of less than ten meters. On those occasions, location data established the device to be located at 135 Crosby Circle, Greenville, South Carolina. Agents immediately recognized the referenced address as being associated with Shannon DAVIS. DAVIS has a lengthy criminal history including

---

[6] Subpoenaed information shows TT#8 to have been activated on February 13, 2019, and operates under a pre-paid account. The subscriber information is listed in the name of "Tim Jones, 17 Mission Street, Greenville, South Carolina."

multiple felony drug convictions, and was the subject of DEA investigation as recently as 2012, when DAVIS and another subject attempted to smuggle over $140,000 in cash (seized as drug proceeds) aboard a commercial airliner at the Greenville-Spartanburg International Airport.    About ten days after the referenced money seizure, agents executed a search warrant at 135 Crosby Circle, and located cocaine residue in a microwave dish and a pot, which resulted in DAVIS being arrested by the Greenville County Sheriff's Office and charged in state court with Manufacturing Crack Cocaine. Agents familiar with DAVIS also recalled that he would use the alias of "Tee."

13. Through a series of recorded communications, CS-1 and UM-1 agreed to have their designees meet in furtherance of their efforts to finalize a scenario in which they would be comfortable exchanging drugs and money.  As a result of those negotiations between CS-1 and UM-1, Det. Acevedo (acting as CS-1's designee) called "Tee" (later identified as Shannon DAVIS, and hereinafter referred to as such) at TT#8 on February 27, 2019, and agreed to meet with DAVIS in Anderson, South Carolina the next day.

14. On the morning of February 28, 2019 at around 9am, TFO Daniel Stipe rode past the residence located at 135 Crosby Circle, Greenville, South Carolina (the address listed on DAVIS' South Carolina driver's license), and observed the SUBJECT VEHICLE parked in the driveway of the residence.  Later that same day, Det. Acevedo again spoke with DAVIS over TT#8, and arranged to meet with DAVIS over a meal, at a restaurant in Anderson, South Carolina.  When Det. Acevedo and DAVIS actually met that afternoon, surveillance agents observed DAVIS arrive at the meeting driving the SUBJECT VEHICLE.  During the course of their conversation, DAVIS admitted that he was acting at the direction of his associate (UM-1), who was in prison after having been convicted of drug charges.  DAVIS also agreed that he would have the money to purchase a multi-kilogram shipment of cocaine and methamphetamine from Det. Acevedo in the near future.

## IDENTIFICATION OF 7 PEARLS LANE, GREENVILLE, SOUTH CAROLIINA ON MARCH 6, 2019

15. During a series of telephone calls occurring on the evening of March 6, 2019, CS-1 spoke with UM-1, over TT#4. CS-1 expressed concerns as to whether or not UM-1 was prepared to receive a multi-kilogram cocaine and methamphetamine shipment from Det. Acevedo on March 7, 2019, and whether DAVIS would have the requisite cash required to purchase those drugs ($295,000.00). UM-1 stressed that he was ready, so long as everything was ready on CS-1's end.

16. In their ongoing conversations, CS-1 and UM-1 agreed that the safest location in which to consummate their transaction would be a residence, and UM-1 agreed to provide the residence, explaining that it would be either the residence of UM-1's wife, or UM-1's mother-in-law. In one of the conversations occurring on March 6, 2019, CS-1 pressed UM-1 to provide the actual address where the transaction would take place, and UM-1 provided the address of 7 Pearls Lane, Greenville, South Carolina (the TARGET LOCATION).

17. During the course of this investigation, using open source inquiries and other investigative techniques, agents have linked the TARGET LOCATION with a subject identified as Mikeya WILLIAMS. Based on a review of recorded jail calls as well as additional research, agents have established that WILLIAMS maintains a pre-paid telephone bearing telephone number (864) 202-7306 (hereinafter TT#9).[7] A review of those call detail records (commonly known as telephone tolls, and hereinafter CDRs) associated with TT#4 (UM-1's phone) has established that UM-1 is in contact with TT#9 far more than any other number, suggesting that UM-1 is likely extremely close to WILLIAMS. Agents have also established that WILLIAMS has sent money to a number of inmates throughout the South Carolina Department of Corrections, including inmates

---

[7] A review of a recorded call between a subject believed to be WILLIAMS (using TT#9) and an inmate at a local Upstate jail established that WILLIAMS had sent the inmate letters, which sometimes showed a return address of "7 Pearl" and other times an address of "9 Pearl."

at Evans Correctional Institution in Bennettsville, South Carolina.[8,9] I believe it is likely that the TARGET LOCATION is either occupied or otherwise controlled (at least in part) by WILLIAMS, who could be working in concert with UM-1 in furtherance of UM-1's drug-related endeavors.

## ITEMS TO BE SEIZED

18. Based upon the aforementioned facts, I believe there is probable cause to believe that the following items (which agents believe to be evidence of violations of Title 21 USC § 846) will be found in a search of the TARGET LOCATION. The items listed below constitute contraband, evidence and/or instruments of the aforementioned offenses.

    a. Controlled substances and drug paraphernalia.

    b. Currency, financial instruments, precious metals, jewelry, and other items of value, which are the fruits of drug trafficking, and indicative of unexplained wealth as it relates to personal income earnings reported to the IRS.

    c. Firearms and other weapons.

    d. Records of drug transactions, including notes, ledgers, receipts, computers and computer files (whether they exist on the hard drive of a computer, or any removable media), photographs, video tapes (or any other digital/electronic media contained on a device such as a digital video recorder), telephone records, calling cards, and correspondence which contain information on current and past associates, and may be used to identify co-conspirators who have not been identified or located.

---

[8] On March 5, 2019, U.S. Magistrate Judge Kevin F. McDonald authorized an order allowing for the acquisition of geo-location data relative to TT#4. Agents began receiving that data on March 6, 2019, which showed the device to be located precisely in Evans Correctional Institution.

[9] Based on my experience, I know that inmates regularly direct parties outside of prison walls to transfer electronic funds to other inmates, often in return for favors carried out by those inmates receiving the money. The favors in

e.  Fictitious identification and other documents which are intended to conceal identity and avoid detection by law enforcement, including fictitious driver licenses, passports, photo identification cards, and documents relating to fraudulently obtained vehicle titles, registrations, and insurance.

f.  Currently and/or previously used cellular telephones and electronic communications devices, as well as including the electronic contents of those devices (i.e. electronic telephone directories, photographs, text messages, etc.).

g.  Books, records, receipts, notes, ledgers, currency and papers which are evidence of the commission of narcotics and money laundering offenses. The records include tally or ledger sheets; sales and/or purchase invoices; bank, wire transfer and/or other financial institution records; federal and state corporate, partnership, individual and/or other tax and informational returns filed or required to be filed.

19. Based on the aforementioned facts, I respectfully request that a search warrant be issued for the TARGET LOCATION listed in paragraph two of this affidavit.

KEVAN P. KYLE
TASK FORCE OFFICER
DRUG ENFORCEMENT ADMINISTRATION

Subscribed to and sworn before me this  7  day of March, 2019

KEVIN F. MCDONALD
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF SOUTH CAROLINA

---

question can range from criminal acts (i.e. transporting or facilitating the transportation of contraband through the prison) to favors which might not be criminal in nature.

# ATTACHMENT "A"



# 7 Pearls Lane,
# Greenville, South Carolina